**FILED**

U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 06 2017

JAMES W. McCORMACK, CLERK

By: _____
**DEP CLERK**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

**JOHNNY C. SIMPSON and**
**ELIZABETH SIMPSON,**

      **Plaintiffs,**

**v.**

Docket No. 5:17 cv 062 - KGB

**WRIGHT MEDICAL GROUP, INC. and**
**WRIGHT MEDICAL TECHNOLOGY, INC.,**

      **Defendants.**

This case assigned to District Judge _Baker_
and to Magistrate Judge _Harris_

## COMPLAINT FOR DAMAGES

Plaintiffs bring this action for injuries sustained from Defendants' defectively designed hip implant that resulted in bodily injury to Johnny Simpson from corrosion, Cobalt and Chromium metal debris and Cobalt and Chromium metal ion cast off from the stem and neck components.

## PARTIES

1.     At relevant times hereto, Plaintiffs Johnny C. Simpson and Elizabeth Simpson, husband and wife, were and are adult residents and citizens of the State of Arkansas, residing in the County of Arkansas, Stuttgart, Arkansas.

2.     Defendant Wright Medical Group, Inc. is a Delaware corporation with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117, and as such is a citizen of the State of Delaware and is a citizen of the State of Tennessee, and at all times relevant hereto did business in the State of Tennessee and in the State of Arkansas.

3.     Defendant Wright Medical Technology, Inc., is a Delaware corporation, with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117, and is registered to do business in the State of Arkansas, and at all times relevant hereto did business in the State of Arkansas.  Defendant Wright Medical Technology, Inc. is a wholly owned subsidiary of Defendant Wright Medical Group, Inc. (hereinafter referred collectively as "Defendants," "Wright" or "Wright Medical").

4.     Defendant Wright Medical Technology, Inc. was, at all relevant times, engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the Wright Medical Profemur® Hip products that are in issue in this civil action.

5.     Defendant Wright Medical Group, Inc. was, at all relevant times, engaged in the business of designing, manufacturing, importing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the Wright Medical Profemur® Hip products that are in issue in this civil action.

6.     Defendant Wright Medical Group, Inc., itself, and as the parent corporation of Defendant Wright Medical Technology, Inc., and Wright Cremascoli, f/k/a/ Cremascoli Ortho Group, was involved in the business of designing, licensing, manufacturing, importing, distributing, selling, marketing, and introducing into commerce within the State of Arkansas, either directly or indirectly through third parties or related entities, numerous orthopedic products, including the Wright Medical Profemur™ Hip System, and the Wright Medical cobalt chromium ("CoCr") Profemur® Modular Neck, as well as conducting post market surveillance,

2

monitoring and reporting adverse events, and having a role in the decision process and response of the Wright Medical defendants, if any, related to these adverse events.

## JURISDICTION & VENUE

7.      This Court has diversity jurisdiction pursuant to 28 U.S. C. §1332. The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, as this action involves a products liability claim by a severely injured party. There is complete diversity of citizenship between the parties.

8.      Defendants are subject to the *in persona* jurisdiction of this Court, and venue is therefore proper pursuant to 28 U.S.C. §1391, as Defendants did have and continue to do business within the State of Arkansas and have had continuous and systematic contacts with the State of Arkansas, and have consented to jurisdiction in the State of Arkansas. Defendants are corporations and deemed to reside in a judicial district in which they are subject to personal jurisdiction. 28 U.S.C. §1391(c). As Defendants are subject to personal jurisdiction in Arkansas, and a substantial part of the events giving rise to this claim occurred in this judicial district, venue is proper in this Court. 28 U.S.C. §1391(a)(1).

9.      At all times relevant hereto, Defendants developed, manufactured, advertised, promoted, marketed, sold and/or distributed the defective ProFemur® Total Hip System, including the ProFemur® (cobalt chromium) neck and titanium femoral stem components, throughout the United States, including Arkansas.

3

## FACTUAL ALLEGATIONS

### PLAINTIFF JOHNNY C. SIMPSON'S PROFEMUR HIP

10.     On or about December 14, 2012, Plaintiff Johnny C. Simpson had a Wright artificial hip implanted in his left hip in a procedure known as a total hip arthroplasty (or "THA").

11.     Orthopedic surgeon C. Lowry Barnes, M.D. ("Dr. Barnes") implanted the Wright artificial hip in Mr. Simpson.

12.     Plaintiff's December 14, 2012 hip implant surgery was performed at the St. Vincent Infirmary Medical Center in Little Rock, Arkansas.

13.     Dr. Barnes, did not breach any generally accepted standard of care in the field of orthopedic surgery in his care and treatment of Plaintiff or negligently cause any injury to Plaintiff in any of the following respects:

> (a)     In the care or treatment that he provided to Plaintiff prior to beginning the hip implant surgery;
>
> (b)     In the hip implant surgery he performed on Plaintiff; or
>
> (c)     In the care or treatment that he provided to Plaintiff, subsequent to Plaintiff's hip implant surgery.

14.     Based upon the patient population that Wright intended its Profemur® artificial hip devices to be implanted in, at the time of implantation with his Wright Profemur® hip devices, Plaintiff Johnny Simpson was an appropriate patient to be implanted with the Wright Profemur® hip devices he received.

15.     Dr. Barnes recommended the Wright Profemur® hip device to Plaintiff and indicated that the Wright Profemur® hip device was appropriate for him.

4

16.     Plaintiff Johnny Simpson reasonably relied upon Dr. Barnes in deciding to proceed with hip replacement surgery and have Wright Profemur® hip device implanted in him.

17.     Before or during the course of the Plaintiff's December 14, 2012 surgery, Defendants arranged for the specific Wright hip components that were implanted in Plaintiff to be delivered to the St. Vincent Infirmary Medical Center and/or Dr. Barnes for implantation in the Plaintiff.

18.     In his total hip replacement surgery on December 14, 2012, Plaintiff Johnny Simpson had implanted in his left hip the following specific Wright artificial hip components:

    (a) Profemur® TL Femoral Stem
       Ref: PRTL-0024
       Size 6 Medial Length 122 mm
       Lot: 1455538;

    (b) Profemur® Plus CoCr Modular Neck
       Ref: PHAC-1202
       Short / Straight
       Taper: SLT- 12/14
       Lot: 1440127;

    (c) Conserve A-Class Total BFH Head
       Ref: 38AM3600
       O.D. Size: 36 mm  Neck Length:  Medium 0mm
       Lot 1462717;

    (d) Dynasty  PC Shell
       Ref: DSPC-GF56
       Size: 56 mm; Group F
       Lot: 1416980; and

    (e) Dynasty A-Class Std Poly Liner
       Ref: DLXP-GF36
       I.D. Size 36 mm
       Lot: 1475854.

19.     At the time of implant, each of the components of the Plaintiff's Wright hip was in substantially the same condition in all relevant respects as when they left Defendants' control.

5

20.     Subsequent to the date of implantation of his Wright artificial hip, Plaintiff used his Wright artificial hip in a normal and reasonably foreseeable manner.

21.     After initial recovery and for a period of time from implant surgery, Plaintiff's Wright total hip implant performed as expected.

22.     On or about February 2, 2016, not quite four-and-a-half years after the implant surgery, Plaintiff Johnny Simpson reported to Dr. Barnes for revision surgery of his left hip prosthesis.   Dr. Barnes recommended the revision surgery after Plaintiff Johnny Simpson presented with elevated cobalt ion levels, pain and weak abductor function.

23.     Plaintiff Johnny Simpson's revision surgery was necessary due to a failed metal-metal junction corrosion issue at the CoCr modular neck and titanium stem.

24.     The revision surgery was performed by Dr. Barnes at the University of Arkansas for Medical Sciences ("UAMS") Hospital in Little Rock, Arkansas.

25.     In the revision operative report, Dr. Barnes noted "[t]he abductors were quire atrophic and had pseudotumor-like reaction on their articular surface."   He went on to state, "[t]he neck was removed from the stem and there was marked trunnionosis."

26.     In the course of the revision surgery performed on February 2, 2016, Dr. Barnes removed Plaintiff's Wright Medical hip components, except for the Dynasty PC Shell.

27.     With the exception of the fact that the CoCr Modular Neck of Plaintiff's artificial hip had corroded and caused injury to the Plaintiff, at the time of its revision on February 2, 2016, Plaintiff's Wright Medical hip was not otherwise in need of hip revision surgery.

## WRIGHT MEDICAL GROUP

28.     Profemur® Modular Necks were first patented by Cremascoli, and marketed by it in 1986.

6

29.     In December 1999, Defendant Wright Medical Group, Inc. acquired Cremascoli Ortho, its product lines, documents, and manufacturing facilities, including the Profemur® line of hip products.

30.     After the acquisition of Cremascoli, Wright re-designed the Profemur® modular artificial hip stem and modular neck and expanded the product line to include additional models or versions of Profemur® Stems and Profemur® Modular Necks.

31.     After the acquisition of Cremascoli, Wright branded what is at times referred to by Wright as the Wright Medical Profemur® Total Hip System.

32.     In 2001, a "re-styling" of the Profemur® Modular Necks' mid-body was completed.

33.     Sometime after the date of August 25, 2009, Wright Medical began to offer for distribution and sale in the United States Profemur® Modular Necks made of a cobalt-chromium alloy [CoCr] instead of the previous Profemur® Modular Necks comprised of titanium.

34.     Wright Medical Group, Inc., itself has been a plaintiff in a civil action filed in this United States District Court, Case No. 3:10-cv-00033, filed on February 18, 2010, and represented to this District Court in the Complaint filed in that civil action that it, Wright Medical Group, Inc., does business as Wright Medical Technology, Inc.

35.     In the Form 10(k) filed by Defendant Wright Medical Group, Inc., with the United States Securities and Exchange Commission, for the fiscal year ended December 31, 2001, on page 2 of that document, said Defendant states:

> Wright Medical Group, Inc. (the "Company") is a global orthopaedic device company specializing in the design, manufacture and marketing of reconstructive joint devices and bio-orthopaedic materials.

7

36.    In the Form 10(k) filed by Defendant Wright Medical Group, Inc., with the

United States Securities and Exchange Commission for the fiscal year ended December 31,

2001, on page 2 of that document, Wright Medical Group, Inc., states:

> [O]n December 22, 1999, the Company acquired Cremascoli Ortho Group
> ("Cremascoli"), based in Toulon, France.

37.    In the Form 10(k) filed by Defendant Wright Medical Group, Inc., with the

United States Securities and Exchange Commission for the fiscal year ended December 31,

2001, on page 8 of that document Wright Medical Group, Inc., states:

> Through the Company's acquisition of Cremascoli, several hip implant
> products designed for the European market, including the
> ... PROFEMUR-TM-R Hip System, were acquired ... The
> PROFEMUR-TM-R hip stem is a revision replacement implant with a
> patented modular femoral neck component . . . .

## THE WRIGHT MEDICAL PROFEMUR HIP

38.    Since 1985, Defendant, Wright Medical Technology, Inc., directly or through its

parent corporation, subsidiaries or affiliates, Wright Medical Group, Inc., Wright Medical

Europe, S.A., Cremascoli Ortho, Wright Cremascoli Ortho, and others, designed, manufactured,

labeled, marketed, promoted, distributed, and sold in the United States the artificial hips with

modular components.

39.    Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc.

began to manufacture, label, market, promote, distribute and sell in the United States the Wright

Medical Profemur® Hip System and its components, including the Profemur® Hip System

modular necks and stems.

40.    Between the dates of December 13, 2000 and August 25, 2009 the Profemur® Hip

System included neck and stem components made of a titanium alloy, generally known as

Ti6Al4V.

8

41.     After Wright titanium Profemur® Modular Necks began to be implanted, Wright received reports of its Profemur® titanium modular necks fracturing (i.e., breaking into two pieces) at the oblong taper distal end where it is seated in the Profemur® stem.

42.     At some point in time prior to July 30, 2010, Wright had notice that higher than normal rates of early failure of the long offset Profemur® titanium modular necks due to fretting and corrosion have been observed in patients.

43.     As the number of reported Wright titanium Profemur® Modular Neck fractures continued to increase, case studies appeared in medical journals reporting the fracture of Wright titanium Profemur modular necks.

44.     As the number of reported Wright titanium Profemur® Modular Neck fractures continued to increase, Wright began to design and develop a Profemur modular neck made of a cobalt chrome [CoCr] alloy.

45.     On April 16, 2009, Wright submitted a Section 501(k) premarket notification of intent to market a device generally identified as Profemur® hip system modular necks made of a cobalt chrome alloy to the United States Department of Health & Human Services, Food and Drug Administration [FDA].

46.     Sometime on or after August 25, 2009, Wright began to offer with the Profemur® Hip System a modular neck component made of a cobalt chrome alloy for distribution in the United States.

47.     In promoting its Profemur® CoCr Modular Necks Wright claimed that these cobalt chrome modular necks would result in less fretting than occurred with titanium modular necks.

9

48.    The design of the Wright Medical Profemur® CoCr modular neck, when coupled with the design of the Wright Medical titanium Profemur® hip stems, is such that it in fact promotes the process of fretting corrosion at the modular neck/stem junction.

49.    In promoting its Profemur® CoCr modular necks, Wright Medical claimed that the use of dissimilar metals, such as mating a CoCr modular neck with a titanium stem, would not result in galvanic corrosion, a corrosion process not unlike what takes place with a car battery, at a level that would be problematic for patients.

50.    Wright's claims that mating a CoCr Modular Neck with a titanium stem would not result in galvanic corrosion at a level that would be problematic for patients, were not supported by unbiased, sound scientific testing.

51.    Claims by Wright that mating Profemur CoCr Modular Necks with Profemur titanium stems would not result in galvanic corrosion at a level that would be problematic for patients were false and misleading.

52.    The CoCr Profemur® modular necks that Wright Medical designed and manufactured were designed to be used with most, if not all, of the same femoral heads and most, if not all, of the same Profemur® hip stems as were its titanium Profemur® modular necks.

53.    In promoting its Profemur® CoCr modular necks Wright Medical has stated, "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for PROFEMUR® CoCr Modular Necks." [See Profemur® CoCr Modular Necks Frequently Asked Questions, Wright Medical publication MH 1619-812]

54.    The claim by Wright Medical in promoting its Profemur® CoCr modular necks Wright Medical has stated, "Product complaint data reported to Wright to date does not indicate

an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for PROFEMUR® CoCr Modular Necks," was not supported by unbiased sound scientific testing.

55.     The claim by Wright Medical that "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for PROFEMUR® CoCr Modular Necks" was false and misleading.

56.     In promoting its Profemur® CoCr modular necks, Wright Medical claimed that these cobalt chrome modular necks would result in less fretting than occurred with titanium modular necks.

57.     Claims by Wright Medical that these cobalt chrome modular necks would result in less fretting than occurred with titanium modular necks was not supported by unbiased sound scientific testing.

58.     Claims by Wright Medical that its Profemur® CoCr modular necks would result in less fretting than occurred with titanium modular necks were false and misleading.

59.     The design of the Wright Profemur® CoCr Modular Neck, when coupled with the design of the Wright Medical titanium Profemur® hip stems, is such that it in fact promotes the process of fretting corrosion at the modular neck/stem junction.

60.     In promoting its Profemur® CoCr modular necks, Wright Medical claimed that the use of dissimilar metals, such as mating a CoCr modular neck with a titanium stem, would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients.

11

61.     Claims by Wright Medical that mating a CoCr modular neck with a titanium stem would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients, were not supported by unbiased sound scientific testing.

62.     The design of the Wright Profemur CoCr Modular Neck, when coupled with the design of the Wright titanium Profemur hip stems is such that it in fact promotes the process of galvanic corrosion at the modular neck/stem junction.

63.     Prior to offering its Profemur CoCr Modular Necks for distribution or sale in the United States, Wright did not adequately test its design of CoCr Profemur modular necks for fretting corrosion or the biological effect of the corrosion on the body after implantation in patients.

64.     Prior to offering its Profemur CoCr Modular Necks for distribution or sale in the United States, Wright did not adequately test its design of CoCr Profemur modular necks for galvanic corrosion after implantation in patients.

65.     Prior to offering their Profemur CoCr Modular Necks for distribution or sale in the United States, Wright did not adequately test its design of CoCr Profemur modular necks for galvanic corrosion when mated with titanium Profemur hip stems after implantation.

66.     Wright rushed the Profemur CoCr Modular Necks to market without adequately testing them for in vivo performance to resist fretting corrosion or test the effects of corrosion on human tissue.

67.     Wright's rush to market was done to preserve market share and its profits from the sale of its Profemur hip products.

12

68. Prior to December 14, 2012, Wright had been informed that its Profemur CoCr modular necks were corroding in patients to the extent that revision surgeries were necessary to remove the Profemur CoCr Modular necks.

69. Wright knew or should have known that as of December 14, 2012, the date Plaintiff received his Wright Medical CoCr neck and titanium modular stem:

      a) Wright had not adequately tested the Profemur CoCr Modular Necks to simulate in vivo performance for resistance to fretting corrosion;

      b) Wright had not adequately tested the Profemur CoCr Modular Necks to simulate in vivo performance for resistance to galvanic corrosion;

      c) Wright's Profemur CoCr Modular Necks would be subject to fretting corrosion;

      d) There was an increased risk of fretting corrosion at the neck stem junction;

      e) There was an increased risk of galvanic corrosion at the neck stem junction; and,

      f) There was a substantial risk that patients' bodies would be adversely affected by the exposure to corrosion, metal debris and metal ions.

70. The neck stem junctions of the Profemur cobalt-chromium modular neck, coupled with a Profemur titanium hip stem, are subject to significant movement which results in fretting corrosion, galvanic corrosion, and metal ion release.

71. The neck stem junctions of the Profemur cobalt-chromium modular neck, coupled with a Profemur titanium hip stem, and the movement which results in significant fretting corrosion, galvanic corrosion, and metal ion release, directly and proximately causes adverse medical conditions which led to the failure, revision surgery and damage to the Plaintiff's hip.

13

72.     Product complaint data reported to Wright prior to December 14, 2012 indicated an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur CoCr Modular Necks when coupled with Wright Medical Profemur titanium hip stems, as compared to traditional titanium necks.

73.     Product complaint data reported to Wright prior to December 14, 2012 indicated an increased risk of adverse events due to galvanic corrosion, as compared to traditional titanium necks when coupled with a Wright Medical Profemur hip stems.

74.     Based upon what Wright knew or should have known before December 14, 2012, Wright should have informed orthopedic surgeons using its Profemur hip products that there is an increased risk of galvanic corrosion for Wright Medical Profemur CoCr Modular Necks when coupled with Wright Medical Profemur titanium hip stems.

75.     Based upon the facts and allegations set forth above, the Wright Medical Profemur CoCr Modular Neck, Profemur titanium modular stem and the Profemur hip system are defective in design in that the risks inherent in this product's use for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have gained by placing this defective product in the body of Plaintiff Johnny Simpson.

76.     Additionally, the Wright Medical Profemur CoCr Modular Neck, Profemur titanium modular stem and the Profemur hip system implanted in Plaintiff Johnny Simpson were defective in their manufacture, as they were manufactured such that the tolerances between the stem and neck components did not comply with Wright's design specifications.

77.     Based upon the facts and allegations set forth above, the Wright Medical Profemur CoCr Modular Neck and the Profemur hip system are defective in their labeling in that they do not perform as represented, and the risks that were inherent in this product being used for

14

hip replacement, when weighed against the utility or benefit derived from the product, outweigh any alleged benefit.

78. Based upon the facts and allegations set forth above, the Wright Medical Profemur CoCr Modular Necks, Profemur titanium modular stem and the Profemur hip system are unreasonably dangerous in that the risks that were inherent in this product being used for hip replacement, when weighed against the alleged utility or benefit derived from the product, outweigh the benefit.

79. Defendants were negligent in their design, manufacture, distribution and sale, marketing, promotion, and labeling of the Wright Medical Profemur CoCr Modular Neck, Profemur titanium modular stem and the Profemur hip system.

80. Defendants were negligent in the failure to warn patients and/or surgeons that they had received product complaint data that did indicate an increased risk of adverse events due to taper junction fretting and corrosion, as compared to other available safe alternative devices.

81. Defendants were negligent in the failure to warn patients or surgeons that they had received product complaint data that did indicate an increased risk of adverse events due to galvanic corrosion, as compared to other available safe alternative devices.

**PLAINTIFF JOHNNY SIMPSON'S INJURIES AND DAMAGES**

82. On or about February 2, 2016 it was discovered that the Profemur® CoCr Modular Neck implanted in Plaintiff Johnny Simpson's left hip failed, meaning that due to corrosion of the oblong taper of the CoCr Modular Neck where it seated in the pocket of the Profemur® titanium stem it was causing continuing and otherwise irreversible physical injury to the Plaintiff.

15

83.     On or about February 2, 2016, the Profemur® hip system implanted in Plaintiff Johnny Simpson's left hip was discovered to have failed as a direct and proximate result of the actions, conduct, negligence, and breach of warranties of the Defendants, as alleged in this Complaint.

84.     As a direct and proximate result of the conduct of Defendants as set forth in this Complaint, Plaintiff Johnny Simpson sustained injuries and damages including, but not limited to undergoing surgery to remove and replace his failed Wright Profemur hip; past and future pain and anguish, both in mind and in body; permanent diminishment of his ability to participate in and enjoy the affairs of life; medical bills associated with the replacement procedure and recovery therefrom; future medical expenses; loss of enjoyment of life; loss of past and future earnings and earning capacity; disfigurement; physical impairment, and other injuries not fully known at this time.

85.     Plaintiff Johnny Simpson's injuries suffered were both factually and proximately caused by the Defendants' defective Profemur hip system.

86.     Plaintiff Johnny Simpson's injuries suffered were both factually and proximately caused by the Defendants' unreasonably dangerous Profemur hip system.

87.     Plaintiff Johnny Simpson is entitled to recover for all economic and special damages incurred, including but not limited to damages for subsequent surgeries, rehabilitative services, follow up doctor visits and all expenditures incurred as a result of the additional operations and follow up procedures.

88.     Plaintiff Johnny Simpson is entitled to compensation for permanent disability as a result of the failure of this Wright Medical Profemur hip replacement device which caused substantial injury.

16

89.     Plaintiff Johnny Simpson further shows that he is entitled to recover for all noneconomic and compensatory damages allowed by law, including, but not limited to, pain and suffering for all pain and suffering that she has incurred as a result of the defective product, the follow-up surgery, rehabilitation, and constant pain that occurs as a result of the failure of the product.

90.     Plaintiff avers that he is entitled to recover for loss of wages as a result of the Defendants' negligence.

## LIABILITY

### COUNT 1 – NEGLIGENT DESIGN AND FAILURE TO WARN OR INSTRUCT

91.     Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-90 of this Complaint.  Plaintiffs assert this cause of action against all Defendants.

92.     Defendants owed a duty of reasonable care to the general public, including Plaintiff Johnny Simpson, when it designed, manufactured, assembled, inspected, tested, marketed, placed into the stream of commerce, and sold the Wright Medical Profemur CoCr Modular Neck, the Wright Medical Profemur titanium modular stem and the Wright Medical Profemur Total Hip System, to protect users from an unreasonable risk of harm when using the device for its intended purpose, in a reasonably foreseeable manner.

93.     Defendants breached this duty by designing, manufacturing, assembling, inspecting, testing, marketing, distributing and selling the Wright Medical Profemur CoCr Modular Neck, the Wright Medical Profemur titanium modular stem and the Wright Medical Profemur Total Hip System in a defective and unreasonably unsafe condition including, but not limited to, its foreseeably appreciated risk of harm from the device's propensity for fretting,

17

corrosion and failure. A reasonably careful medical device manufacturer would not have acted in this manner

94.     Likewise, Defendants owed Plaintiff Johnny Simpson a duty of reasonable care to discover the defects and to inform and/or warn him or his implanting surgeon of the defects once they was discovered, and Defendants failed to warn of the dangers inherent in the reasonably foreseeable use of the Wright Medical Profemur Total Hip System, further placing Plaintiff at risk for harm and injury.

95.     Defendants were negligent in the particulars set forth in this Complaint, and such negligence was a direct and proximate cause of the incident and injuries set forth herein.

## COUNT 2 – STRICT PRODUCTS LIABILITY: DEFECTIVE DESIGN

96.     Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-90 of this Complaint.  Plaintiffs assert this cause of action against all Defendants.

97.     Plaintiff Johnny Simpson was damaged by the defective Wright Medical Profemur CoCr Modular Neck, the Wright Medical Profemur titanium modular stem, and the overall Wright Medical Profemur Total Hip System, including but not limited to having to undergo revision surgery less than 4.5 years post-implant and multiple subsequent dislocations of the femoral head from the acetabular shell.

98.     Wright was engaged in the business of manufacturing, selling and distributing the Medical Profemur CoCr Modular Neck, the Wright Medical Profemur titanium modular stem, and the overall Wright Medical Profemur Total Hip System.

99.     The Wright Medical Profemur Total Hip System used in Plaintiff Simpson's hip replacement surgery was supplied in a defective condition in its design, such that it would

18

experience motion, fretting and corrosion at the stem-neck juncture, rendering it unreasonably dangerous.

100.    The Wright Medical Profemur Total Hip System's defective condition proximately caused Plaintiffs' damages.

## COUNT 3 – STRICT PRODUCTS LIABILITY: MANUFACTURING DEFECT

101.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-90 of this Complaint.  Plaintiffs assert this cause of action against all Defendants.

102.    Plaintiff was damaged by the defective Wright Medical Profemur CoCr Modular Neck, the Wright Medical Profemur titanium modular stem, and the overall Wright Medical Profemur Total Hip System, including by having to undergo revision surgery less than 4.5 years post-implant.

103.    Wright was engaged in the business of manufacturing, selling and distributing the Medical Profemur CoCr Modular Neck, the Wright Medical Profemur titanium modular stem, and the overall Wright Medical Profemur Total Hip System.

104.    The Wright Medical Profemur Total Hip System used in Plaintiff Johnny Simpson's hip replacement surgery was supplied in a defective condition in its manufacture, such that it would experience motion, fretting and corrosion at the stem-neck juncture, rendering it unreasonably dangerous.

105.    The Wright Medical Profemur Total Hip System's defective condition proximately caused Plaintiffs' damages.

## COUNT 4 – STRICT PRODUCTS LIABILITY – FAILURE TO WARN

106.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-90 of this Complaint.  Plaintiffs assert this cause of action against all Defendants.

19

107.    Plaintiff Johnny Simpson was damaged by the defective Wright Medical Profemur CoCr Modular Neck, the Wright Medical Profemur titanium modular stem, and the overall Wright Medical Profemur Total Hip System, including by having to undergo revision surgery less than 4.5 years post-implant.

108.    Wright was engaged in the business of manufacturing, selling and distributing the Medical Profemur CoCr Modular Neck, the Wright Medical Profemur titanium modular stem, and the overall Wright Medical Profemur Total Hip System.

109.    The Wright Medical Profemur Total Hip System used in Plaintiff's hip replacement surgery was supplied in a defective condition, because the Defendants failed to provide an adequate warning to consumers, implanting surgeons and the public, including Plaintiff and his implanting surgeon Dr. Barnes, regarding the hazards associated with the reasonable and foreseeable use of the Wright Medical Profemur CoCr Modular Neck with the Wright Medical Profemur titanium modular stem, and the Wright Medical Profemur Total Hip System, including micromotion, fretting and corrosion at the stem-neck juncture that could lead to early failure of the device. This failure to warn rendered the device unreasonable dangerous

110.    The Wright Medical Profemur Total Hip System's defective condition proximately caused Plaintiffs' damages.

111.    At the time of the incident set forth herein, the Wright Medical Profemur CoCr Modular Neck coupled with the Wright Medical Profemur titanium modular stem as part of the Wright Medical Profemur Total Hip System were dangerous to an extent beyond that which would be contemplated by the ordinary health care provider and patient utilizing the product, with the ordinary knowledge common to the medical community as to the product's characteristics.

20

112.    Health care providers and patients, including Plaintiff and orthopedic surgeon Dr. Barnes, did not know and should not have been expected to know of the dangerous characteristics of the Wright Medical Profemur CoCr Modular Neck when coupled with the Wright Medical Profemur titanium modular stem as part of the Wright Medical Profemur Total Hip System, which had the potential to cause injury and damage.

113.    As a direct and proximate result of the Defendants' failure to warn, Plaintiff Johnny Simpson sustained serious injuries and was damaged.

## COUNT 5 – NEGLIGENT MISREPRESENTATION

114.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-90 of this Complaint.  Plaintiffs assert this cause of action against all Defendants.

115.    Defendants had a duty to accurately and truthfully represent to the medical community, Plaintiff, and the public that Wright Medical Profemur CoCr Modular Neck, and the Wright Medical Profemur Total Hip System, had not been adequately tested and found to be safe and effective for the treatment of patients requiring a hip replacement.  Instead, the Defendants made representations about the device that they, at a minimum, should have known to be false.

116.    Defendants negligently misrepresented to the medical community, implanting orthopedic surgeon Dr. Barnes, Plaintiff, and the public the Wright Medical Profemur CoCr Modular Neck coupled with the Wright Medical Profemur titanium modular stem in the Wright Medical Profemur Total Hip System's presented a low risk of unreasonable and dangerous adverse side effects.

117.    Additionally, in various marketing and promotional material published and distributed by Wright Medical from approximately the year 2002, and into the year 2005, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the

21

general public, Wright Medical made the following representations, statements, claims and guarantees about its Profemur® modular necks:

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent #4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty. Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant guarantees:
>
> - Structural reliability
> - Absence of significant micromovement
> - Absence of fretting corrosion

[e.g., Wright Medical Technical Monograph MH688-102 ©2002, and ©2004]

118.   The above quoted statement by Wright Medical that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks was false at the time it was first made by Wright Medical.

119.   The above quoted statement by Wright Medical that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks was false at the time Wright Medical stopped making that statement in its printed publications in the year 2005.

120.   Wright Medical has never corrected or recanted the above quoted statement by Wright Medical that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks.

121.   Testing done by Wright Medical prior to the year 2003 proved that fretting corrosion occurred with its Profemur® modular necks.

122.   Post market surveillance conducted by Wright Medical from the years 2003 through 2008 proved that fretting corrosion occurred with its Profemur® modular necks.

123.   Testing done by Wright Medical in 2008-2009 proved that fretting corrosion occurred with its Profemur® modular necks.

22

124.    In various marketing and promotional material published and distributed by Wright Medical from approximately the year 2002, and into the year 2008, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made the following representations, statements, claims and guarantees about its Profemur® modular necks:

> In summary, the clinical effectiveness and dependability of modular necks has been consistently demonstrated throughout the clinical history of rights Profemur modular necks. Utilized in both primary and revision applications, the current neck design has been successfully employed to improve surgical outcomes with no reported failures.

[See: Stature™ Modular Hip Reconstruction – Design Rationale – Your stem philosophy. Your next choice. Your crop preference. Wright Medical Technology, Inc. publication MH 179-703, Rev 9.08]

125.    By the date of May 1, 2005, if not before that date, Wright Medical knew that the above quoted statement by Wright Medical that, "Utilized in both primary and revision applications, the current neck design has been successfully employed to improve surgical outcomes with no reported failures," was false.

126.    Wright Medical has never corrected or recanted the above quoted statement "Utilized in both primary and revision applications, the current neck design has been successfully employed to improve surgical outcomes with no reported failures."

127.    After Wright Medical titanium Profemur® modular necks began to be implanted, Wright Medical began to receive reports of its Profemur® titanium modular necks having fractured (i.e., broken into two pieces) at the oblong taper distal end where it is seated in the Profemur® stem.

128.    Had Defendants accurately and truthfully represented to the medical community, Dr. Barnes, Plaintiff, and the public the material facts that it knew or should have known

regarding the risks of the Wright Medical Profemur CoCr Modular Neck coupled with the Wright Medical Profemur titanium modular stem as part of the Wright Medical Profemur Total Hip System, Plaintiff and/or Plaintiff's healthcare provider(s) would not have utilized Defendants' Wright Medical Profemur Total Hip System.

129.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

**COUNT 6 –FRAUDULENT MISREPRESENTATION**

130.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-90 of this Complaint. Plaintiffs assert this cause of action against all Defendants.

131.    Defendants made false representations of material fact to Plaintiff and/or his healthcare providers as to the safety and efficacy of the Wright Medical Profemur CoCr Modular Neck coupled with the Wright Medical Profemur titanium modular neck in the Wright Medical Profemur Total Hip System. Instead of disclosing the heightened risks of erosion, failure, and permanent injury, Wright represented:

    a)  that there was no indication of an increased risk of adverse events due to taper junction fretting and corrosion,

    b)  that lab testing guaranteed structural reliability and the absence of significant micromovement and of fretting corrosion;

24

c)  that product complaint data did not did indicate an increased risk of galvanic corrosion for Wright Medical Profemur CoCr Modular Necks when coupled with Wright Medical Profemur titanium hip stems;

d)  that, "[u]tilized in both primary and revision applications, the current [Profemur modular] neck design has been successfully employed to improve surgical outcomes with no reported failures";

e)  that cobalt-chromium modular necks would result in less fretting than occurred with titanium modular necks; and

f)  that the Wright Medical Profemur Total Hip System, including its component parts, were safe and effective, and were safer and more effective than other treatments for hip replacements.

132.   Defendants knew that the representations alleged in paragraph 131 were false, yet Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in its representations.

133.   Defendants made these false representations with the intent of defrauding and deceiving the medical community (including implanting surgeon Dr. Barnes, Plaintiff, and the public, and to induce the medical community, Plaintiff's implanting surgeon, Plaintiff and the public to utilize its Wright Medical Profemur CoCr Modular Neck coupled with the Wright Medical Profemur titanium modular stem as part of the Profemur Total Hip System. Doing so constituted a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff and the public.

25

134.     Plaintiff and his implanting orthopedic surgeon Dr. Barnes justifiably relied upon Wright's false representations of material fact in deciding to utilize the Wright Medical Profemur Hip System, including the CoCr modular neck and titanium modular stem.

135.     Had Plaintiff or his healthcare providers known the true facts about the dangers and health risks of the Wright Medical Profemur CoCr Modular Neck coupled with the Wright Medical Profemur titanium modular stem as components of the Wright Medical Profemur Total Hip System, they would not have utilized said product.

136.     As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT 7 – LOSS OF CONSORTIUM

137.     Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-90 of this Complaint. Plaintiffs assert this cause of action against all Defendants.

138.     At all times herein mentioned, Plaintiffs Johnny Simpson and Elizabeth Simpson were, and are, legally married as husband and wife.

139.     As a direct and proximate result of Defendants' defective Profemur Total Hip System and tortious conduct, and as a result of the injuries and damages to Plaintiff Johnny Simpson arising therefrom, Plaintiff Elizabeth Simpson has been deprived of the love, companionship, comfort, affection, society, solace or moral support, protection, loss of enjoyment of sexual relations, and loss of physical assistance in the operation and maintenance

26

of the home, of her husband, Johnny Simpson, and has thereby sustained and will continue to sustain damages.

140.    Plaintiff Elizabeth Simpson is entitled to recover damages for her loss of consortium in an amount to be proven at trial.

**COUNT 8 – PUNITIVE DAMAGES**

141.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-90 of this Complaint.  Plaintiffs assert this cause of action against all Defendants.

142.    Defendants knew or ought to have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury or damage and continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred.  Accordingly, Plaintiff is entitled to an award of punitive damages.

**DAMAGES**

143.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-90 of this Complaint.

144.    As a direct and proximate result of the acts and omissions of the Defendants alleged herein, Plaintiffs were injured and damaged.  The injuries and damages for which Plaintiffs seeks compensation from the Defendants include, but are not limited to:

    a.    physical pain and suffering of a past, present and future nature;

    b.    emotional pain and suffering of a past, present and future nature;

    c.    permanent impairment and scarring;

    d.    medical bills and expenses of a past, present and future nature;

    e.    loss of enjoyment of life;

    f.    loss of income;

g.  pre- and post-judgment interest;

h.  statutory and discretionary costs;

i.  damages for Mrs. Simpson's loss of consortium; and

j.  any and all such other and further legal and equitable relief as the Court deems necessary, just and proper.

## PRAYERS FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs sue the Defendants for personal injuries and prays for a judgment against the Defendants for compensatory damages in an amount considered fair and reasonable by a jury, and for all such further relief, both general and specific, to which Plaintiffs may be entitled under the premises.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs sue the Defendants for personal injuries and prays for a judgment against the Defendants for punitive damages in an amount considered fair and reasonable by a jury, and for all such further relief, both general and specific, to which they may be entitled under the premises.

## A TRIAL BY JURY IS RESPECTFULLY DEMANDED.

Dated:  March 3, 2017

Respectfully submitted,

N. Kirkland Pope
GA Bar No. 584255
POPE McGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
Atlanta, GA  30326
Ph: (404) 523-7706
Fx: (404) 524-1648
efile@pmkm.com

*Attorneys for Plaintiff*

28